**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**PUERTO RICO ASSOCIATION OF MAYORS,**

**Plaintiff,**

v.

**HON. WALTER VÉLEZ-MARTÍNEZ, in his Official Capacity,**

**Defendant.**

**CASE NO. 20-1405 (GAG)**

## OPINION AND ORDER AND PERMANENT INJUNCTION

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017).

Plaintiff, the Puerto Rico Association of Mayors, filed suit challenging the constitutionality of certain provisions of Circular Letter OCE-DET-2020-02, issued by defendant, the Puerto Rico Elections Comptroller. (Docket No. 1). Namely, the Mayors argue, said determination "broadens the definition of what is considered official electronic media to web/social media pages the content of which is provided by a 'principal officer', regardless of whether or not the page is maintained with public funds." Id.

Plaintiff challenges Defendant's proposed policy "wherein it is announced that the purpose of the circular policy letter is to consider as official web/social media pages those in which content is provided mainly by a "principal officer' (a term that encompasses all mayors) regardless of

whether or not such page was created and/or is maintained by said officers privately." (Docket No. 1 ¶ 3.17). "The challenged circular letter explicitly provides that, once a personal electronic media page is deemed "official" under the loose definition that includes a mayor's personal media, said media may not include any references to elections, candidates or even flattering remarks regarding the officer's performance in office. Defendant clearly seeks to regulate the content of the speech contained in a candidate's private electronic media." (Docket No. 2). Plaintiff asserts the Mayors have the right to express their political views and to advocate for their election/the defeat of their opponents, and that this right extends to electronic social media. "Any restriction on the content of plaintiffs' personal social media pages is deemed unconstitutional unless the government is able to show that there are compelling state interests and that the restriction is the narrowest possible." Id. In conclusion, Plaintiff contends that the Mayors are "entitled to a declaration that the proposed regulation of the political content in the personal electronic media of mayors, as stated in OCE-DET-2020- 02 is in violation of the First Amendment's protection of freedom of speech." (Docket No. 1 ¶ 3.26).

## I.   Relevant Factual and Procedural Background

After hearing from Defendant, the Court granted Plaintiff's request for preliminary injunction, finding that "the mayors will suffer immediate and irreparable constitutional harm. Enforcing the First Amendment is also in the public interest. Finally, the Elections Comptroller has not presented any compelling government interest that outweighs the freedom of political expression." (Docket No. 17), and issued a preliminary injunction prohibiting the Elections Comptroller from enforcing OCE-DET-2020-02 as to the personal social media accounts of plaintiff mayors. Id. Moreover, the Court ordered both the plaintiff and Elections Comptroller to show

cause by Monday, August 17, 2020 "as to why the Court should not convert its preliminary injunction to a permanent one and enter judgment accordingly."

Plaintiff complied. (Docket No. 21) Defendant filed a Memorandum in compliance and Motion to reconsider and Set Aside Preliminary Injunction (Docket No. 23) arguing that the Court committed manifest error of law by granting the preliminary injunction.  Namely, Defendant contends the Court erroneously held OEC's Determination OCE-DET-2020-02 "patently unconstitutional on its face as applied to private social media accounts of candidates seeking reelection or another elected government position." (Docket No. 17).  In essence, Defendant argues that "[the Determination does not abridge free speech and was tailored to serve compelling government interests: to avoid the unconstitutional utilization of public funds and deter corruption."  Moreover, he posits that it "allows all mayors to freely express themselves through their personal or private campaign media accounts. What the Determination forbids is the use of public funds or resources for electioneering purposes during the period known as the 'veda electoral.'" (Docket No. 23 at 13).

Plaintiff responded in opposition, arguing: 1) that "the main argument against plaintiffs' claim remains an audacious contention that neither the appearing parties, nor the Court, were able to correctly read OCE-DET-2020-02 and comprehend its scope", and 2) The plain language of OCE-DET-2020-02, clearly means to censor the content of plaintiffs' personal electronic media if they use any identifiers of the office that they hold, in which case, they may not engage in political/campaign speech. The hard fact is that the government has no business regulating the political speech of its citizens, absent a very compelling public interest.  (Docket No. 24).

Civil No. 20-1405 (GAG)

A. <u>OCE-DET-2020-02</u>

The Office of the Puerto Rico Elections Comptroller, created by Puerto Rico Law 222 of November 18, 2011, as amended, P.R. LAWS ANN. tit. 16, § 621, *et seq.*, has statutory authority to monitor *official* government web and social media pages for improper political content and to level administrative fines against those who violate this norm.

Specifically, with regard to web and social media pages of government entities, Article 10.006 (4) provides that:

> Web pages and portals of the three branches of the Government and of municipal governments, **including their respective official contents on social media**, may continue to operate and be broadcasted, as long as **they do not include any display of achievements, messages, slogans or symbols related to political campaigns; and they do not favor or disfavor the figure or image of any elected official or of any contender or candidate for public office by election**.
>
> In the event that a breach is detected or a complaint is lodged in relation to the prohibitions of this paragraph, the public entity involved may be required to make the necessary modifications and adjustments or even to immediately refrain from any further cybernetic publication whatsoever.
>
> In order to enforce the aforementioned restrictions, the Act delegated in the OEC the passing of regulations to establish rules and procedures for evaluating and awarding public broadcasting expenses financed with Government of Puerto Rico funds, pursuant to clear, objective and uniform parameters. In compliance with the mandate of the Act, the OEC passed Regulations No. 39 on Oversight of Public Broadcasting Expenses (hereinafter "Regulations 39"). Section 2.9 of said Regulations established the criteria for evaluating web and social media pages of government entities.

(Docket No. 10-1 at 3) (emphasis in original. In keeping with these Regulations, the OEC has the power to review web and social media pages to detect any potential violation of Article 10.006 of Act 222 or these Regulations. (Docket No. 10-1 at 2-3) (In re: Official Web and Social Media Pages of Government Entities and Chief Officers, OCE-DET-2020-02, DECISION ON THE OFFICIAL

WEB AND SOCIAL MEDIA PAGES OF GOVERNMENT ENTITIES AND CHIEF OFFICERS.) [1]

Circular Letter OCE-DET-2020-02 further extends its scope. "[I]in addition to official pages of government entities," individual social media accounts or pages may be considered *official* individual social media pages or accounts if: 1) these are accessible to the public-at-large, regardless of their classification, and 2) their "content . . . is provided by a Main Official, either elected or not or by persons directly supervised by the Main Official, be they public employees, contractors or volunteers, and who promote the Main Official by performing official duties or identifying him/her by his/her post as a Main Official."

> To determine whether a page is of an official nature, even if the page is published on a platform that is <u>not</u> controlled or created by the government entity or the Chief Officer, such as, for example, Facebook, Twitter, Instagram, YouTube, among others, the OEC shall examine one or more of the following factors, which were considered in <u>Knight First Amendment Institute v. Trump</u>, [928 F.3d 226, 239–40

---

[1] The Determination goes further and provides a of content that "*cannot* be published on official web pages or in official social media contents, among other contents: 1. Matters related to election campaigns, personal matters or matters related to personal business;  2. Biographies that include the trajectory of a Chief Officer, his achievements, programs, projections or projects, slogans, phrases or logos including political partisanship content; 3. Information about collective political events or ways to make donations to the campaign committees of contenders, candidates, parties or any other political committee, including donations to the campaign committee of the Chief Officer, as a contender or candidate; 4. Contents developed through the use of resources provided by a contender, candidate, party, their respective committees, or any other political committee, including resources of the campaign committee of the Chief Officer as a contender or candidate;  5. Contents that do not constitute official matters of the agency or the Chief Officer; 6.  Expressions in favor or against individuals listed as contenders or candidates, political committees or parties of any type; 7. Recommendations on how to vote in an electoral event; 8. Any other contents that can only be reasonably interpreted to advocate for the election or defeat of a political party, political ideology, contender or candidate, or that entirely reproduce the campaign material of a political party, political ideology, contender or candidate; 9. Any use of live-streaming technology shall also comply with the same rigorous restrictions on the use of the contents mentioned herein, including the display of the Chief Officer's figure,   . . .

(Docket Nos. 10-1 at 3; 22-1 at 3).

Civil No. 20-1405 (GAG)

(2d Cir. 2019)] and <u>Davidson v. Randall</u>, [912 F.3d 666, 682 (4th Cir. 2019)], to determine whether a page published on the Internet or social media is official or private:

1. Whether or not the Chief Officer is identified on the web or social media page with the public position that he holds (either through a description, seals, symbols or logos used on the page);
2. Whether or not the Chief Officer uses the web page or social media account to publish official business that he conducts in his capacity as Chief Officer;
3. How other agencies or their Chief Officers refer to and treat the web page or social media account.
4. Whether employees are used during governmental work time, facilities or resources, or such services are paid for through public funds.

(Docket Nos. 10-1 at 22-1 at 3.)   The determination further clarifies the meaning of "use of public funds, "the fact that the government entity does <u>not</u> use its funds to maintain the page or the contents of the account of the Chief Officer in his social media account of preference does not exempt the entity from the application" of the aforementioned policy. (Docket Nos. 10-1 at 3; 22-1 at 4). "The mere use of employees during work hours, including the work hours of the Chief Officer himself, or of government facilities, is included in the concept of "public funds and properties" . . . " <u>Id.</u>   "Once the contents of a webpage or social media account are considered to constitute official contents, such page or account of the Chief Officer shall be subject to the regulations and prohibitions laid down in the aforementioned Section 2.9 of Regulations 39." (Docket Nos. 10-1 at 3; 22-1 at 4). The prohibitions established in Circular Letter OCE-DET-2020-02 do not apply to social media pages/accounts, which are <u>not</u> accessible to the public, whose content is private or restricted those granted access by the account administrator.

**II.     Legal Analysis and Discussion**

Civil No. 20-1405 (GAG)

Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, . . . " Snyder v. Phelps, 562 U.S. 443, 460-61, (2011).

### A. The First Amendment and political speech

At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50–51 (1988). "[T]he freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." Id. (quoting Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 503–504 (1984)).

> The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.

Hustler Magazine, Inc., 485 U.S. at 51.

The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 508 (D.C. Cir. 2016).  "The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Connick v. Myers, 461 U.S. 138, 145 (1983); see also Roth v. United States, 354 U.S. 476, 484 (1957); New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U.S. 64, 74–75 (1964).

> Justice Frankfurter put it succinctly in Baumgartner v. United States, 322 U.S. 665, 673–674 (1944), when he said that "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures." Such criticism, inevitably, will not always be

> reasoned or moderate; public figures as well as public officials will be subject to "vehement, caustic, and sometimes unpleasantly sharp attacks. [T]he candidate who vaunts his spotless record and sterling integrity cannot convincingly cry 'Foul! when an opponent or an industrious reporter attempts to demonstrate the contrary.

Hustler Magazine, Inc., 485 U.S. at 51-52). "As Justice Holmes wrote, "when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market. . . ." Hustler Magazine, Inc., 485 U.S. at 51 (quoting Abrams v. United States, 250 U.S. 616, 630 (1919) (dissenting opinion)). "The First Amendment safeguards an individual's right to participate in the public debate through political expression and political association". McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 203 (2014).

  a. <u>The Internet and Social Media</u>

"[T]he Internet can hardly be considered a 'scarce' expressive commodity. It provides relatively unlimited, low-cost capacity for communication of all kinds. The Government estimate[d] that '[a]s many as 40 million people use the Internet today, and that figure is expected to grow to 200 million by 1999." Reno v. Am. Civil Liberties Union, 521 U.S. 844, 870 (1997)(alterations in original). "This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue." [2] Id. In Packingham, the Supreme Court acknowledged that

---

[2] On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. On LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed,

"[s]ocial media offers "relatively unlimited, low-cost capacity for communication of all kinds." 137 S. Ct. at1735–36.

Circular Letter OCE-DET-2020-02's prohibits individual social media pages or accounts if: 1) these are accessible to the public-at-large, regardless of their classification, and 2) their "content . . . is provided by a Main Official . . ." (Docket Nos. 10-1 at 3; 22-1 at 3). Consequently, pursuant to the OEC's Regulation, social media accounts of Plaintiff mayors, as public figures, may be deemed official by the OEC, and thus, its content is restricted as if it were an official government entity account—even if no government funds are used.

Defendant argues the Determination "does not bar sitting mayors from disclosing in their social media that they currently hold a public position, as well as their achievements as government officials." Moreover, Defendant posits that "the Determination provides that any Chief Officer who runs for office can freely express himself "on web pages or social media accounts of the campaign committee or on *private* pages or accounts." (Docket No. 24) (Emphases added). As stated above, per the OEC's determination, *private* social media accounts are those that are not accessible to the general public. The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." Cohen v. California, 403 U.S. 15, 24, (1971).

---

Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose. Reno, 521 U.S. at 870.

Defendant insists that "Plaintiffs' speech is not suppressed because there are no speech restrictions as to their *personal* or *private* campaign social media accounts/pages. Defendant further contends, "The Determination does not ban a government official from highlighting his/her achievements in his/her personal social media." (Docket No. 23 at 6) (Emphasis in original). Meaning, Mayors can speak freely in accounts th*at are not available to the public-at-large*. Defendant adds, "[t]hey can freely speak through their social media if they do not use public funds or resources." Id.

The Court sees no connection as to how restricting an elected official or candidate's audience on social media, the government's objective, the safekeeping of public funds. "It is well established that, as a general rule, the Government "may not suppress lawful speech as the means to suppress unlawful speech." Packingham, 137 S. Ct. at 1738 (quoting Ashcroft v. Free Speech Coalition, 535 U.S., at 255). "The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." Cohen, 403 U.S. at 24. "As a matter of constitutional tradition, in the absence of evidence to the contrary, we presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." Reno, 521 U.S. at 885. "The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." Id.

Moreover, Plaintiff correctly points out that, per the text of OCE-DET-2020-02, the use of public funds is not the guiding principle of the regulation at issue. (Docket No. 24 at 6). "[T]he fact

10

Civil No. 20-1405 (GAG)

that the government entity does not use its funds to maintain the page or the contents of the account of the Chief Officer in his social media account of preference does not exempt the entity from the application of the aforementioned Article 10.006 of Act 222 and Regulations 39." Id. Moreover, Plaintiff argues that "Defendant seems to suggest that the fact that a mayor or an employee or his [/]hers[] posts something in a personal electronic media page during business hours, such action automatically brings the expression within the purview of the Comptroller's regulating authority." (Docket No. 24 at 6).

Similar to the reasoning above, the Court finds no reasonable explanation as to how the government sustains that the purpose of the determination is the safekeeping of public funds yet, social media accounts may be subject to its restrictions even if public funds are not used to maintain the page or the contents of the account. (Docket Nos. 10-1 at 3; 22-1 at 4).

The Supreme Court has "consistently rejected attempts to suppress campaign speech based on other legislative objectives. No matter how desirable it may seem, it is not an acceptable governmental objective to "level the playing field," or to "level electoral opportunities," or to "equaliz[e] the financial resources of candidates" McCutcheon, 572 U.S. at 206–07. The First Amendment prohibits such legislative attempts to "fine-tun[e]" the electoral process, no matter how well intentioned. Id. "In drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." Id. (quoting Federal Election Comm'n v. Wisconsin Right to Life, 551 U.S. 449, 457 (2007) (opinion of ROBERTS, C.J.)).

The mandate of the circular letter at bar restricts the political speech of all political candidates who currently hold government office. OCE-DET-2020-02 is patently unconstitutional

on its face as applied to *private* and/or *personal* social media accounts of candidates seeking reelection or another elected government position even if public funds are not used.

### III.     Permanent Injunction

A plaintiff seeking a permanent injunction before a district court must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Esso Standard Oil Co. v. Lopez-Freytes, 522 F.3d 136, 148 (1st Cir. 2008); see also eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 390, 1 (2006). Where a plaintiff seeks permanent injunctive relief, the test is the same [as for preliminary injunctive relief], except that the movant must show actual success on the merits of the claim, rather than a mere likelihood of success." Siembra Finca Carmen, LLC. v. Sec'y of Dep't of Agric. of Puerto Rico, 437 F. Supp. 3d 119, 137–38 (D.P.R. 2020).

In The Shell Co. (P.R.) Ltd. v. Los Fraties Serv. Station, Inc., 605 F.3d 10, 19 (1st Cir. 2010), the First Circuit affirmed the district court's conversion of a preliminary injunction to a permanent injunction when the trial court did so "only after issuing a show cause order to [the defendant], and only after determining that [the defendant] had not advanced any new evidence or legal arguments beyond what it had presented at the preliminary injunction hearing." 605 F.3d at 19.

####     A.  Irreparable Harm

"A burden on protected speech always causes some degree of irreparable harm."  Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 15 (1st Cir. 2004) (citing Elrod v. Burns, 427 U.S. 347, 373-74 (1976)). "The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." Eu v. San Francisco Cty. Democratic Cent. Comm., 489 U.S. 214,

Civil No. 20-1405 (GAG)

223 (1989). Political speech is unquestionably entitled to the highest degree of constitutional protection. See Burson v. Freeman, 504 U.S. 191, 196 (1992).

### B. No other adequate remedy

There is no other remedy at law. Plaintiff does not seek monetary damages.

### C. Public interest

"It can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346–47 (1995) (quotations omitted). "The interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." Reno, 521 U.S. at 885.

This no more than reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co., 376 U.S. at 270. "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation." McIntyre, 514 U.S. at 346-47.

### D. Balance of hardships

A lot is at stake here: the First Amendment right of public officials and candidates exercising constitutionally protected speech on social media–almost two month shy of Puerto Rico's general elections and in the midst of an unprecedented global pandemic.

The First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." Pursuing Am.'s Greatness, 831 F.3d at 508. Without an injunction, the mayors will suffer immediate and irreparable constitutional harm. Moreover, the Elections

Civil No. 20-1405 (GAG)

Comptroller has failed to present a compelling government interest that outweighs the freedom of political expression. His primary justification for issuing OCE-DET-2020-02 assumes that public resources will be used towards candidates' social media campaigning will, and that the guise of First Amendment will be nonetheless used to circumvent the mandates of the United States and Commonwealth constitutions. "As a matter of constitutional tradition, in the absence of evidence to the contrary, we presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." Reno, 521 U.S. at 885.

The Supreme Court noted in Citizens United v. Fed. Election Comm'n, 558 U.S. 310 (2010) that the suppression of political speech harms not only the speaker, but also the public: "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." 130 S.Ct. at 898. "To deprive plaintiffs of the right to speak will therefore have the concomitant effect of depriving 'the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration.'" Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 15 (1st Cir. 2012) (quoting Citizens United, 130 S.Ct. at 899).

For the reasons stated above, Defendant's Motion for Reconsideration is **DENIED** and Plaintiff's request for permanent injunction is **GRANTED**.

**SO ORDERED.**

In San Juan, Puerto Rico this 26th day of August 2020.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge